UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UP STATE TOWER CO., LLC,

             Plaintiff,

    -vs-

THE TOWN OF KIANTONE, NEW YORK; THE
TOWN BOARD OF THE TOWN OF KIANTONE,
NEW YORK; and THE BUILDING
DEPARTMENT OF THE TOWN OF KIANTONE,
NEW YORK,

             Defendants.

_____

**DECISION and ORDER
No. 1:16-cv-00069-MAT**

## INTRODUCTION

This case arises under the Telecommunications Act of 1996 ("TCA"), 47 U.S.C. § 151 et seq. Presently before the Court is the motion for reconsideration filed by Up State Tower Co., LLC ("Plaintiff") seeking reconsideration of this Court's decision and order dated December 9, 2016, granting in part and denying in part the summary judgment motion filed by the Town of Kiantone ("the Town"), the Town Board of the Town of Kiantone ("the Town Board"), and the Building Department of the Town of Kiantone (collectively, "Defendants"); and granting in part and denying in part Plaintiff's cross-motion for summary judgment. In particular, the Court granted summary judgment in Plaintiff's favor on the first cause of action, to the extent that the Town was ordered to issue a decision within 20 days on Plaintiff's application for a cell tower permit. On December 19, 2016, the Town issued a Resolution Denying the

Application of Up State Tower Co., LLC for Town Tower Permit, Area Variances and Site Plan Review (Dkt #19-2).

In the pending reconsideration motion, Plaintiff seeks a different equitable remedy on its first cause of action, namely, an injunction directing the Town to issue a resolution granting the cell tower application and any required variances. Plaintiff also renews its cross-motion for summary judgment on the second cause of action, alleging that the Town has effectively prohibited wireless services in violation of the TCA. Finally, Plaintiff requests permission to amend the complaint to add a fifth cause of action alleging that the Town's denial of its application was not based on substantial evidence in violation of the TCA.

Defendants filed a memorandum of law in opposition (Dkt #20-3) to Plaintiff's motion for reconsideration and renewed motion for summary judgment on the second cause of action. Plaintiff filed a reply memorandum of law (Dkt #21).

For the reasons discussed below, Plaintiff's motion for reconsideration is denied; Plaintiff's renewed motion for summary judgment on the second cause of action is denied; and Plaintiff's motion to amend the complaint is granted.

**DISCUSSION**

**I.    The Motion for Reconsideration**

The standard for granting a motion for reconsideration under Federal Rule of Civil Procedure ("F.R.C.P.") 59(e) "is strict, and

reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995) (citing Schonberger v. Serchuk, 742 F. Supp. 108, 119 (S.D.N.Y. 1990) ("The only proper ground on which a party may move to reargue an unambiguous order is that the court overlooked 'matters or controlling decisions' which, had they been considered, might reasonably have altered the result reached by the court."); Adams v. United States, 686 F. Supp. 417, 418 (S.D.N.Y. 1988) (same)). "The provision for reargument is not designed to allow wasteful repetition of arguments already briefed, considered and decided[,]" Schonberger, 742 F. Supp. at 109 (citations omitted)), and "a motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." Shrader, 70 F.3d at 257.

Plaintiff takes issue with the Court's grant of 20 days for the Town to issue a decision on its application, rather than ordering the Town to grant the application outright. Plaintiff attempts to show that it has "new evidence" that warrants the grant of prospective, permanent injunctive relief—namely, the Town's December 19, 2016, denial of Plaintiff's application. According to Plaintiff, because the denial occurred after the challenged

Decision and Order, is "new evidence that the [T]own's failure to act within the shot-clock period was not 'in and of itself,' [sic] but was part of a series of acts and steps taken by the Town to disregard its responsibility to decide the application within a reasonable time. . . ." (Plaintiff's Reply at 3). Not only is this argument both grammatically and logically unclear, it is meritless. Plaintiff cites a case that the Court already considered in connection with its previous decision, <u>Crown Castle NG East, Inc. v. Town of Greenburgh</u>, No. 12-CV-6157 CS, 2013, and simply rehashes arguments it previously made and which the Court found unconvincing. Plaintiff also suggests that the Town's recent denial of the application renders the Court's choice of equitable relief (ordering the Town to issue a decision within a circumscribed period) manifestly unjust. Plaintiff's argument relies on "new evidence" that was not in existence at the time of the Court's decision since the Town had not yet ruled on the cell tower application. Thus, Plaintiff has not pointed to any "matters," <u>Schonberger v. Serchuk</u>, 742 F. Supp. at 119, that were "overlooked," <u>id.</u>, by this Court, and "which, had they been considered, might reasonably have altered the result reached by the [C]ourt." <u>Id.</u> Nor has Up State "point[ed] to controlling decisions . . . that the court overlooked . . . that might reasonably be expected to alter the conclusion reached by the court." <u>Shrader</u>,

70 F.3d at 257. In short, Plaintiff has not come close to meeting the "strict" standard for granting reconsideration.

## II.        The Motion to Amend the Complaint

Plaintiff requests leave to amend the complaint to add a cause of action under 47 U.S.C. § 332(c)(7)(B)(iii) on the basis that the Town's December 19, 2016 resolution denying its application was not based on substantial evidence.

F.R.C.P. 15(a)(2) provides that "[t]he court should freely give leave [to amend] when justice so requires," and Rule 15(a) caselaw focuses heavily on the prejudice to the nonmoving party." In re Adelphia Commc'ns Corp., 452 B.R. 484, 486 (Bankr. S.D.N.Y. 2011). "A Rule 15(a) motion should be denied only for reasons as undue delay, bad faith, futility of the amendment, and perhaps the most important, the resulting prejudice to the opposing party." Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 603-04 (2d Cir. 2005) (internal quotations and citation omitted).

Since the proposed amended claim only arose on December 19, 2016, the Court finds that Plaintiff has not unduly delayed in moving to amend, or acted in bad faith. Nor can the Court say that the amendment would be futile. Defendants have not presented any argument at all in opposition to Plaintiff's request to amend. Given their silence, the Court presumes that Defendants will not suffer any appreciable prejudice if the amendment is permitted. The Court accordingly will exercise its discretion to grant Plaintiff's

motion to amend the complaint. See Enzymotec Ltd. v. NBTY, Inc., 754 F. Supp. 2d 527, 538 (E.D.N.Y. 2010)("Amendments are generally favored because 'they tend to facilitate a proper decision on the merits.'") (quoting Blaskiewicz v. Cnty. of Suffolk, 29 F. Supp.2d 134, 137 (E.D.N.Y. 1998)).

### III. The Renewed Motion for Summary Judgment on the Second Cause of Action

#### A.   Legal Principles

The TCA mandates that zoning regulations shall not "have the effect of prohibiting the provision of personal wireless services[.]" 47 U.C.C. § 332(c)(7)(B)(i)(II) ("the effective prohibition provision"). The Second Circuit has interpreted the effective prohibition provision to "preclude[ ] denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land-lines." Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 643 (2d Cir. 1999) ("Willoth"). Under the Willoth standard, an applicant will prevail on a claim under the effective prohibition provision if it shows both that a "significant gap" exists in wireless coverage and that its proposed facility is "the least intrusive means" to close that gap. Id. "Moreover, under Willoth, a violation of the effective prohibition provision, 47 U.S.C. § 332(c)(7)(B)(i)(II), requires injunctive relief: an application proposing the 'least intrusive means for closing a significant [coverage] gap' cannot be denied—or, put

differently, it must be granted." T-Mobile Ne. LLC v. Town of Ramapo, 701 F. Supp.2d 446, 463 (S.D.N.Y. 2009) (citing Willoth, 176 F.3d at 643 ("hold[ing] only that the [TCA]'s ban on prohibiting personal wireless services precludes denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land-lines")). "[T]he burden for the carrier invoking th[e] [effective prohibition] provision is a heavy one: to show from language or circumstances not just that this application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." Town of Amherst, N.H. v. Omnipoint Commc'ns Enterprises, Inc., 173 F.3d 9, 14 (1st Cir. 1999); accord, e.g., Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals, 297 F.3d 14, 20 (1st Cir. 2002). Since Up State has moved for summary judgment on this count, the Court reviews the evidence in a light most favorable to Defendants. See, e.g., Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) ("The trial court must, in considering the motion, view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'") (internal citation omitted; quotation omitted).

**B.   The Existence of a Significant Coverage Gap**

As to the "significant gap" prong, Defendants apparently do not dispute that Plaintiff has met its burden.[1]   The Court accordingly turns to the only issue in dispute—whether Plaintiff's proposed facility at 1710 Foote Avenue is the "least intrusive means" of remedying its coverage gap and thus meets the second prong of the Willoth test.

**C.   The Relative Intrusiveness of the 1710 Foote Avenue Site**

Plaintiff's preferred site is located at 1710 Foote Avenue (New York State Route 60), in the City of Jamestown, New York, in a district zoned B-1 (Business). On a 30-foot by 50-foot site on the 1710 Foote Avenue parcel, Plaintiff proposes to construct a 180-foot-tall cell tower, with a 10-foot antenna mounted at 180 feet; there also will be an equipment platform with exterior equipment cabinets and certain other site improvements made.

Communications towers are allowable uses in the B-1 District, provided that the applicant submits a Town Tower Permit application, a site plan, and applications for any variances required pursuant to Town of Kiantone Local Law No. 2 of 1999, also

---

[1]

The record indicates that at one point, Plaintiff was providing Blue Wireless wireless services using an "existing tower, . . . located .43 miles north of the proposed site, at Foote Ave. & Brad St. which [was] in the middle of the 1 mile." However, for reasons that are not clear from the record, Plaintiff stated, at the August 13, 2015, Town Board meeting, that Blue Wireless has removed its service from the Brad Street tower. See CMS Report ¶ 2 (Dkt #19-2, p. 150 of 259).

referred to as the Town of Kiantone Telecommunications Facilities Law ("TKTFL") (Dkt #19-2, pp. 76-83 of 259 (Copy of Ordinance)).

At the Town Board's hearing on August 31, 2015 (Dkt #19-2, pp. 85-89 of 259 (Minutes of 8/31/15 Meeting)), Up State's attorney, Daniel Brennan, Esq., ("Brennan") along with its consultant, Don Carpenter ("Carpenter"), appeared. Up State advised the Town Board that its site selection was focused in the Business District along Foote Avenue because the TKTFL requires cell towers to be located in a Business District. The tower is being built to accommodate Blue Wireless, which Carpenter described as "a life line provider low income subsidized tower."[2] Carpenter also expressed that Blue Wireless is required by FCC rules to establish a set amount of towers within a designated time period, but did not indicate what that deadline is. Carpenter stated that "the coverage is for the entire town and that they do not wish to be located in the city of Jamestown[,]" and in fact had "removed themselves from the current tower already located along the [Foote Avenue] corridor." A resident expressed the opinion that the Foote Avenue location was "not appropriate for the size of the tower presented"

---

[2]  "The FCC established the Lifeline program in 1985 to ensure that qualifying low-income consumers could afford phone service and the opportunities and security it provides. Congress supported and strengthened Lifeline in the Telecommunications Act of 1996, requiring that affordable service and advanced communications be available to low-income consumers across the country." https://www.fcc.gov/consumers/guides/lifeline-support-affordable-communications.

and recommended talking "to Mr. Shuver[3], across the street in an area away from homes." Up State responded that Schuver had been approached but he "requested too much money for his property rental." The Town's attorney, Paul V. Webb, Esq. expressed concerns that setback variance request of more than 350' feet was "substantial," and that although the proposed location was a B-l area, it would "impact a residential zone."

Subsequently, the Town of Kiantone Planning Board ("the Planning Board") met separately to review Up State's application in conjunction with the TKTFL (Dkt #19-2, pp. 91-92 of 259 (Planning Board Report)). The Planning Board found that, in light of various provisions of the TKTFL, Up State would require at least five variances. (See id.). First, TKTFL § 29.6 (Limitation on Siting of New Towers, B. Residential Areas) provides that "[n]o new towers shall be allowed within a residential zoning district, or within 250 feet of the boundary of a residential zoning district." Up State requested a variance reducing the distance to 160 feet.

Second, TKTFL § 29.8 (Additional Application Requirements for New Tower Sites, F. Fall Down Zone), as applied to Up State's application, would result in a fall down zone of 280 feet in diameter (the height of the tower (according to Up State, 180 feet) plus 100 feet). The Planning Board opined that a fall down zone of

---

[3]

This individual's name is actually G. Barton Schuver ("Schuver"). In addition to Location 19, Schuver owns several other parcels evaluated by Up State in the SSSJR.

this size would greatly affect several residences located within that diameter by decreasing their property values.

Third, under TKTFL § 29.9 (Permit Standards For New Tower, C - Traffic, Access and Safety, 2), Up State needed a 1-foot variance because their proposed fence was only 6 feet in height with a 1-foot barbed wire surround (for a total of 7 feet).

Fourth, TKTFL § 29.10 (Tower Setbacks and Height Requirements, A. New Tower Setbacks, 1. General Requirements, A. Yards) provides that cell towers must be set back a minimum of the tower height (according to Up State, 180 feet) plus 100 feet from any front, side or rear property line, for a total distance of 280 feet. The tower, as situated, would only be 53 feet, 48 feet, and 28 feet from the northern, southern, and eastern property lines, respectively. The CMS report stated that Up State's drawings showed 10-foot antennas, mounted at 180-feet, making a total tower of 185 feet, not 180 feet. The CMS report noted that this height discrepancy also affects the amount of variance required for the property line set backs.

Fifth, TKTFL § 29.10 (Tower Setbacks and Height Requirements, A. New Tower Setbacks, 1. General Requirements, B. Structures) provides that cell towers shall be set back a minimum of 500 feet, or the tower height plus 100 feet, whichever is greater, from any residential dwelling, school or historic structures or any public road. Up State requested a variance for set backs of 386 feet from

Foote Avenue, 227 feet from the northern property line, 232 feet from the southern property line, 252 feet from the eastern property line and 190 feet from Warren Jamestown Boulevard, with an additional 138 feet from 1718 Warren Jamestown Boulevard.

Sixth, TKTFL § 29.10 (Tower Setbacks and Height Requirements, A-New Tower Setbacks, B. Height Limitations, 2-Structure Antenna Height) provides the entire tower structure, including the antennae, shall not exceed 175 Feet. This necessitated Up State requesting a 5-foot variance. However, the CMS report indicated that Up State's drawings showed 10-foot antennas, mounted at 180-feet, making a total tower of 185 feet. The CMS report stated that Up State actually needed a 10-foot variance under this section.

In summary, the Planning Board recommended as follows:

> In conversations at the Town Board Public Hearing and the Planning Board Public Hearing, it was revealed by Up State Tower Co., LLC that there is suitable property in other locations but they are not zoned Commercial. The Planning Board believes that this project will only be viable in another location with less set back variances in a less populated area. Should Up State Tower Co., LLC obtain another site that meet these criteria then the Planning Board would recommend the variance given to be out of the Commercial Zone and any smaller variances required.

(Dkt #19-2, p. 92 of 259). The Town's attorney shared the Planning Board's recommendations about exploring other locations, outside of the Town's Business District, with Up State. (Dkt #19-2, p. 97 of 259 (Letter dated 9/10/15)).

At the Town Board hearing on December 10, 2015, Up State's attorney, consultant, and radio frequency ("RF") engineer, Eric Wong, presented a new Supplemental Site Selection and Justification Report ("SSSJR") (Dkt #19-2, pp. 259), covering 19 locations predominantly located in the Town's Business District, near 1710 Foote Avenue, the site originally selected. The minutes note "that after considering 19/20 [sic] possible sites in the current site zone, Upstate [sic] Tower has determined that there are no other suitable sites in the Town of Kiantone according to their radio frequency study." Up State's consultant presented an explanation of the additional areas investigated, and opined that Up State Tower did the "best investigation [possible] for alternative sites." In particular, the viability of Location 19 as an option for siting the tower, details of the negotiations with the parcel's owner Schuver, are highly contested by the parties. In the SSSJR dated December 10, 2015, and presented to the Town Board at the meeting, Up State indicated that "after extended discussions with the property owner[, Schuver], acceptable lease terms could not be reached." The meeting minutes indicate that Up State represented to the Town Board that it was "satisfied with original site and [was] asking for approval[,]" notwithstanding the concerns expressed by several Town Board members, residents, and other elected officials of the Town. Schuver then stated on the record he "had been in talks with Blue Wireless regarding the placement of the tower on

-13-

his property [and] added comments regarding financial matters with Blue Wireless" and said "that he hasn't 'closed the door' to [further negotiations with] Blue Wireless." The minutes do not reflect whether any of the Up State representatives present at the meeting responded to Schuver's statements.

Plaintiff focuses on the Schuver negotiations in its attorney's affidavit submitted in support of the renewed motion for summary judgment. There, Plaintiff's attorney criticizes the Town's resolution denying Plaintiff's application because it

> fails to mention the problems associated with the Shuver [sic] property or the failure of Up State Tower and Shuver [sic] to reach a meeting of the minds; nor does it mention that Shuver's [sic] property was not a preferred location of the Plaintiff from an RF perspective. The Shuver [sic] parcel also required variances; the parties could not agree on the precise location of the tower on the property; they could not agree on price or lease terms; they could not agree on cancellation and renewal rights; and being near neighbors was also an issue.

Affidavit of Plaintiff's Attorney, Reuben Ortenberg, Esq. ("Pl's Atty Aff."), ¶ 16 (Dkt #19-1).

As an initial matter, "[a]n attorney's affidavit is typically used to present documents to the court and should not be used as counsel's personal vehicle to lobby the court." Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC, No. 01 CIV. 6600(RLC), 2005 WL 3370542, at *3 (S.D.N.Y. Dec. 12, 2005), aff'd sub nom. ITIS Holdings Inc. v. Southridge Capital Mgmt. LLC, 329 F. App'x 299 (2d Cir. 2009). There is no indication that Plaintiff's attorney has any personal knowledge of the negotiations with

Schuver or the evaluation of Location 19 as a suitable site, yet he makes multiple factual averments concerning these matters and uses them as grounds for his client's arguments. Not only the form, but portions of the affidavit's contents are problematic since many statements in it appear to be inadmissible hearsay. See Internet Law Library, Inc., 2005 WL 3370542, at *3 (granting motion to strike affidavit where "Tate, attorney for the plaintiffs, engages in extensive argumentation and draws numerous conclusions of law. Tate further swears to several matters of which he could have no direct personal knowledge of as an attorney that came upon this matter after the fact. The Second Tate Affidavit is more akin to a memorandum of law than to an attorney's affidavit"); see also Dedyo v. Baker Eng'g N.Y., Inc., No. 96 CIV. 7152(LBS), 1998 WL 9376, at *4 (S.D.N.Y. Jan. 13, 1998) ("'A motion to strike is appropriate if affidavits contain inadmissible hearsay or are not made on the basis of personal knowledge; only those portions of the affidavit based on personal knowledge will survive the motion.'") (quoting 11 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE ¶ 56.14[4][a] (3d ed. 1997) (citations omitted in original)).

In opposition to Plaintiff's renewed summary judgment motion, Defendants' attorney, Paul V. Webb, Esq., who was present at the December 10, 2015 Town Board hearing, submitted an affidavit contesting Plaintiff's assertions that "Schuver was only willing to negotiate a 60' x 60' parcel in the corner of his 97-acre

parcel[,]" i.e., Location 19. (See Affidavit of Defendants'
Attorney Paul V. Webb, Esq. (Dkt #20) ¶ 29). Defendants' attorney
avers that Schuver "specifically advised Up State and the Town
Board that he was willing to negotiate with Up State over the
entire 87-acre parcel[,]" (id. ¶ 30), but "Up State indicated to
the [Town] Board and Mr. Schuver that they were not interested in
negotiating" and "requested the Town Board decide its application.
. . ." (Id. ¶ 31). Schuver also submitted an affidavit in
opposition to Plaintiff's renewed summary judgment motion,
recounting his version of the negotiations with Up State. According
to Schuver, he was interested in leasing to Up State, but states
that their negotiations "ended after Up State changed its position
over some minor issues leading [him] to conclude it did not deal
with [him] in good faith." (Affidavit of G. Barton Schuver
(Dkt #20-2, pp. 139-42 of 157) ¶¶ 7-8). Schuver also avers that at
the hearing on December 10, 2015, he advised "Up State's
representative, Don Carpenter, and the Town Board . . . that [he]
was more than willing to try to work out a suitable arrangement to
lease a portion of [his] property identified as Location 19 to Up
State[,]" but "Carpenter . . . indicated that they [Up State/Blue
Wireless] were not agreeable to discussing any lease arrangements
with [him] but wanted the town to immediately act on their
application." (Id. ¶¶ 11-12).

In addition, the Town points to the report (Dkt #19-2, pp. 150-53 of 259) prepared by its independent consultant, Richard Comi ("Comi") of The Center For Municipal Solutions ("CMS"), which raises numerous issues as to whether Plaintiff's proposed site is the "least intrusive" option. The CMS report notes that there is an existing tower, located .43 miles north of the proposed site, at Foote Avenue & Brad Street, which is in the middle of the 1-mile search radius, and questions why Plaintiff cannot co-locate on this tower; co-locating a tower, if possible, is required under the TKTFL, and an applicant must provide documentation regarding this. The CMS report also notes that one of the reasons for the new tower offered by Plaintiff is that the "Blue Wireless network does not currently provide adequate service in the area south of Newland Avenue." The CMS report indicates that Newland Avenue is in the City of Jamestown, about 1 mile north of the proposed site; given that the Jamestown border is 0.3-mile north of the proposed site, a significant amount of coverage provided by the new tower would be outside the Town. The CMS report comments that although the Town Board and Planning Board requested Plaintiff to investigate locations with less zoning impact, ten of the 19 additional sites evaluated by Plaintiff in the SSSJR were on the same side of Foote Avenue as the proposed site, and were not very deep, as another road runs behind them; therefore, they have the same need for larger setback variances. The CMS report also questioned why

Plaintiff never explored sites such as the Jamestown School Sports Complex property located off Martin Road that is a "suitable, less intrusive property at an elevation of 130' to 150' higher than the proposed site."

Plaintiff insists that the Town and this Court cannot consider the CMS report—or any other material—whose issuance post-dates the expiration of the "shot clock."[4] Plaintiff acknowledges no legal support for this proposition, but nevertheless contends that the expiration of the shot clock effectively marks the closure of the administrative record. Plaintiff also contends that it is not required to cure any deficiencies, errors, or inaccuracies in its application materials that were identified by Defendants after 30 days of the application date. The Court disagrees. See Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y., No. 12-CV-6157 CS, 2013 WL 3357169, at *3 (S.D.N.Y. July 3, 2013), aff'd, 552 F. App'x 47 (2d Cir. 2014). In Crown Castle NG E. Inc., the plaintiff attempted to make a similar argument based on the shot clock after it had not received a response on its application within 30 days,

---

4

    See Petition for Declaratory Ruling (Shot Clock Order ), 24 F.C.C. Rcd. 13994 (2009), aff'd sub nom. City of Arlington, Tex. v. FCC, 668 F.3d 229 (5th Cir. 2012), aff'd, 133 S.Ct. 1863, (2013). In its Shot Clock Order, the FCC interpreted the "reasonable period of time" language in 47 U.S.C. § 332(c)(7)(B)(ii) to presumptively mean "90 days to process personal wireless service facility siting applications requesting collocations, and . . . 150 days to process all other applications," such as Plaintiff's application here. A "failure to act" under 47 U.S.C. § 332(c)(7)(B)(v) would occur after this period expires. Id. at 14005. As relevant to Plaintiff's argument, the FCC noted that "the time it takes for an applicant to respond to a request for additional information will not count toward the 90 or 150 days," but "only if that State or local government notifies the applicant within the first 30 days that its application is incomplete." Id. at 14015.

and asserted that "because the Town had not indicated that Plaintiff's Chapter 430 Application was incomplete within 30 days of its submission, the application '[was] now deemed complete by operation of default.'" Id. The district court observed that this "appear[ed] to be a misstatement of the Shot Clock Order, which says *only* that for any part of the 90-or 150-day period to be excluded on the ground of the incompleteness of the application, the locality must so notify the applicant within 30 days." Id. at n. 13 (citing Shot Clock Order, 24 F.C.C. Rcd. at 14015). As the district court observed in Crown Castle NG E, Inc., "[t]he Shot Clock Order says nothing about a failure to provide such notice operating as a default." Id.

In summary, the Court finds that Plaintiff has not carried its "heavy burden" of "show[ing] from language or circumstances not just that this application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." Town of Amherst, N.H. v. Omnipoint Commc'ns Enterprises, Inc., 173 F.3d at 14. Therefore, the Court concludes that Plaintiff has not demonstrated its entitlement to judgment as a matter of law on its claim under the effective prohibition provision of the TCA.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for reconsideration is denied; Plaintiff's renewed motion for summary

judgment on the second cause of action is denied; and Plaintiff's motion to amend the complaint is granted.  Plaintiff is directed to file its amended complaint within 20 days of the date of entry of this decision and order.

**SO ORDERED.**

S/Michael A. Telesca

_____
HON. MICHAEL A. TELESCA
United States District Judge

DATED:     March 13, 2017
           Rochester, New York