UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UP STATE TOWER CO., LLC,

                    Plaintiff,

                                          **DECISION and ORDER**
     -vs-                                 **No. 1:16-cv-00069-MAT**

THE TOWN OF KIANTONE, NEW YORK; THE
TOWN BOARD OF THE TOWN OF KIANTONE,
NEW YORK; and THE BUILDING
DEPARTMENT OF THE TOWN OF KIANTONE,
NEW YORK,

                    Defendants.
_____


## INTRODUCTION

Up State Tower Co., LLC ("Plaintiff") commenced this action against the Town of Kiantone, the Town Board of the Town of Kiantone and the Building Department of the Town of Kiantone (collectively, "Defendants") alleging that Defendants violated the Telecommunications Act of 1996 ("TCA"), Pub. L. No. 104–104, 110 Stat. 56 (codified at 47 U.S.C. § 151 et seq., as amended), in denying its application for a special use permit to construct a public utility wireless telecommunication facility. Presently before the Court is Defendants' Second Motion for Summary Judgment. For the reasons discussed below, the motion is denied.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff develops and builds telecommunications facilities on behalf of Blue Wireless, a telecommunications carrier licensed by the Federal Communications Commission ("FCC") to operate in the

Jamestown, New York area, including the Town of Kiantone ("the Town"). The Town is a municipal corporation in Chatauqua County, New York. The Town Board of the Town of Kiantone ("the Board") is the Town's governmental body.

At issue in this litigation is Plaintiff's Tower Permit Application ("the Application") dated July 30, 2015, seeking permission to construct a wireless telecommunications tower at 1710 Foote Avenue, in Jamestown, New York ("the Proposed Site").

On December 9, 2016, this Court issued a Decision and Order granting Plaintiff's motion for summary judgment on as to its first cause of action and ordered, as a remedy, that the Town issue a written decision on the Application within 20 days.

On December 19, 2016, the Board issued a "Resolution Denying the Application of Up State Tower Co., LLC For Town Tower Permit, Area Variances and Site Plan Review" ("the Resolution") (Dkt #39-3). After making a number of factual findings, see id. ¶¶ 1-61, the Board offered several reasons for denying Plaintiff's Application, including that Plaintiff "failed to establish that its proposed facility is the least intrusive means to close Blue Wireless' gap in wireless coverage or that a tower at this location and height is needed to solve Blue Wireless' alleged gap in wireless coverage[.]" Resolution at 13.

On January 9, 2017, Plaintiff filed a motion to reconsider this Court's December 9, 2016 decision. After the Court issued a

Decision and Order denying reconsideration on March 31, 2017, Plaintiff filed a notice of interlocutory appeal as to the December 2016 and March 2017 decisions. The United States Court of Appeals for the Second Circuit affirmed both decisions on December 27, 2017.

Defendants now have filed their Second Motion for Summary Judgment (Dkt ##39 - 39-20) asserting that they are entitled to judgment as a matter of law on Count V of the Amended Complaint (Dkt #24), which alleges that the denial of the Application violated 47 U.S.C. § 332(c)(7)(B)(iii) because it is unsupported by "substantial evidence." Plaintiff has opposed the motion (Dkt ##42 through 42-5), and Defendants have filed a Reply (Dkt #43). The motion was submitted without oral argument on November 27, 2018 (Dkt #44). On February 15, 2019, Plaintiff filed a Response (Dkt #45) presenting supplemental authority[1] in further support of its opposition.

The supplemental authority consists of a Declaratory Ruling and Third Report and Order ("FCC Order") adopted by the Federal Communications Commission ("FCC") on September 26, 2018, and effective January 14, 2019. Plaintiff notes that the FCC clarified the interpretation of what constitutes "an effective prohibition"

---

[1]     The FCC Order is entitled In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment, WT Dkt. No. 17-79 and WC Docket No. 17-84, FCC 18-133, available at https://www.fcc.gov/document/fcc-facilitates-wireless-infrastructure-deployment-5g.

of wireless service for purposes of an "effective prohibition" claim under 47 U.S.C. § 332(c)(7)(B)(i)(II). Defendants did not respond to Plaintiff's submission of the FCC Order. Defendants have not moved for summary judgment on Plaintiff's effective prohibition claim, and it is unclear whether the FCC Order applies to the Resolution issued in December 2016. The Court finds that while the FCC Order is informative, it is not dispositive of this motion.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is deemed "material" for these purposes "if it might affect the outcome of the suit under the governing law." Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001) (citation omitted). A factual issue is "genuine" if "a reasonable jury" could find in favor of the nonmoving party based on that fact. Id. (citation omitted). The initial burden of establishing the absence of any genuine issue of material fact falls on the movant; after that, the burden shifts to the nonmovant to establish the existence of a factual question requiring resolution at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). At the summary judgment stage, "courts are required to view the facts and draw

reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion." Scott v. Harris, 550 U.S. 372, 378 (2007) (quotation and citation omitted).

**DISCUSSION**

## I.  Overview of the TCA

The TCA has been described as "an omnibus overhaul of the federal regulation of communications companies," Sprint Spectrum L.P. v. Willoth, 176 F.3d 630, 637 (2d Cir. 1999), intended "'to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services . . . .'" Id. (quoting H.R. Conf. Rep. No. 104-458, at 113 (1996); other citation omitted). To these ends, the TCA limits State and local governmental authority to deny construction of wireless telecommunications towers, see 47 U.S.C. § 332(c)(7)(B)(i), and prescribes how such decisions must be made, see id. § 332(c)(7)(B)(ii)-(iv). "Although the TCA preserves local zoning authority in all other respects over the siting of wireless facilities, [47 U.S.C.] § 332(c)(7)(A), 'the method by which siting decisions are made is now subject to judicial oversight.'" Willoth, 176 F.3d at 637  (quoting Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 492 (2d Cir. 1999) ("Town of Oyster Bay").

Substantively, the TCA provides that no State or local law may prohibit or have the effect of prohibiting "the provision of

personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). The
TCA procedurally requires that the denial of a request to construct
a wireless facility must be "in writing and supported by
substantial evidence" in the record. 47 U.S.C. § 332(c)(7)(B)(iii).

## II.  The "Substantial Evidence" Standard

When determining whether a denial of a wireless tower permit
application was supported by substantial evidence, courts "must
employ 'the traditional standard used for judicial review of agency
actions.'" Town of Oyster Bay, 166 F.3d at 494 (quoting H.R. Conf.
No. 104-458, at 208 (1996), reprinted in 1996 U.S.C.C.A.N. 124,
223). Substantial evidence requires "less than a preponderance, but
more than a scintilla of evidence [and] 'means such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion.'" Id. (quoting Universal Camera v. NLRB, 340 U.S.
474, 477 (1951) (internal quotations omitted in original)).
"Whether an administrative agency determination is shored up by
substantial evidence is a question of law to be decided by the
courts." Willoth, 176 F.3d at 645 (quoting 300 Gramatan Ave.
Assocs. v. State Div. of Human Rights, 45 N.Y.2d 176, 181 (1978)).
When a Federal court evaluates the evidence underlying a zoning
decision in this area, local and State zoning laws "govern the
weight to be given the evidence." Town of Oyster Bay, 166 F.3d at
494.

## III. The Relevant Local and State Laws

**A. State Law**

In New York State, "cellular telephone companies are afforded the status of public utilities[,]" <u>Town of Oyster Bay</u>, 166 F.3d at 494 (citation omitted), meaning that "a cellular telephone company's application for a variance must be judged by the [local zoning board] on a different standard than that applied to the usual application for a use variance." <u>Id.</u> (citing <u>Consolidated Edison Co. v. Hoffman</u>, 43 N.Y.2d 598, 611 (1978) ("<u>Con Ed</u>")). Under the <u>Con Ed</u> "public necessity" standard, a wireless provider or other public utility must demonstrate that "(1) its new construction 'is a public necessity in that it is required to render safe and adequate service'; and (2) 'there are compelling reasons, economic or otherwise, which make it more feasible.'" <u>Omnipoint Commc'ns, Inc. v. City of White Plains</u>, 430 F.3d 529, 535 (2d Cir. 2005) (quoting <u>Cellular Tel. Co. v. Rosenberg</u>, 82 N.Y.2d 364, 371-72 (1993)). This standard has been interpreted to require that the provider establish the following: "[1] there are gaps in service, [2] . . . the location of the proposed facility will remedy those gaps and [3] . . . the facility presents a minimal intrusion on the community[.]" <u>T-Mobile Ne. LLC v. Town of Islip</u>, 893 F. Supp.2d 338, 355 (E.D.N.Y. 2012) (quoting <u>Site Acquisitions, Inc. v. Town of New Scotland</u>, 770 N.Y.S.2d 157, 160 (3d Dep't 2003) (citing <u>Rosenberg</u>, 82 N.Y.2d at 373-74)).

"As a general rule, if the public utility makes the required showing, which necessarily means the record is devoid of substantial evidence to support a denial, the [application] must issue." Town of Islip, 893 F. Supp.2d at 355 (citing Omnipoint Commc'ns v. Town of LaGrange, 658 F. Supp.2d 539, 555 (S.D.N.Y. 2009)). If, however, the Court "'finds that even one reason given for the denial is supported by substantial evidence, the decision of the local zoning body cannot be disturbed.'" Id. (quoting New York SMSA L. P. v. Town of Oyster Bay Zoning Bd. of Appeals, No. 08-CV-4833, 2010 WL 3937277, *4 (E.D.N.Y. Sept. 30, 2010)); accord, e.g., Cellco P'ship v. Town of Clifton Park, New York, No. 117CV273FJSDJS, 2019 WL 498754, at *4 (N.D.N.Y. Feb. 8, 2019).

**B.   Local Law**

The applicable local law in effect at the time of the Town Board's decision is Local Law No. 2 of 1999, An Amendment of the Zoning Ordinance of the Town of Kiantone, Article XVI, Telecommunications Facilities, a copy of which is attached as Exhibit A (Dkt #1-1) to the Complaint (Dkt #1). The short title of this law is the Town of Kiantone Telecommunications Facilities Law ("the TKTFL"). See TKTFL § 29.1.

Section 29.9 of the TKTFL pertains to "Permit Standards For New Tower" and lists certain criteria to be considered by the Board in approving or denying a request for a tower permit: siting; aesthetics (which encompasses tower type, landscaping, co-locating,

lighting, signs, and ancillary uses); traffic, access and safety; removal of tower; structural safety; and maintenance. See id. § 29.9, ¶¶ A-F. The TKTFL does not state how these factors should be weighed.

When evaluating the evidence supporting the denial of a wireless provider's application, "local and state zoning laws govern the weight to be given the evidence" and the TCA does not "affect or encroach upon the substantive standards to be applied under established principles of state and local law." Town of Oyster Bay, 166 F.3d at 494. Because the TKTFL contains no specific instructions as to the weighing of the relevant factors, the "only limit" on the Board's ability in this regard "is set by the TCA's restriction that municipalities cannot deny applications that would result in the effective prohibition of wireless services, which requires that certain allowances be made where there is a 'need for service' that cannot be closed by 'less intrusive means.'" Willoth, 176 F.3d at 647 (quotation omitted). The foregoing language is reflected in the TKTFL's special variance standard applicable to public utilities. See TKTFL § 29.5(G)(1).

## IV. The Board's Reasons for Denying the Application

The Board's two main reasons for denying Plaintiff's Application were that Plaintiff "failed to establish that [1] its proposed facility is the least intrusive means to close Blue Wireless' gap in wireless coverage or [2] that a tower at this

location and height is needed to solve Blue Wireless' alleged gap in wireless coverage." Resolution at 13. The Board's rationale for these conclusions focused on what it perceived to be Plaintiff's failure to investigate other, less intrusive sites. The Court addresses the reasons proffered by the Board in turn below.

## A.    Proposed Site Not "Least Intrusive"

While the Board relied on its finding that Plaintiff failed to show that its proposed facility is the least intrusive means to close Blue Wireless' gap in wireless coverage, courts in this Circuit have found that the "least intrusive" standard is not the correct standard in connection with a substantial evidence claim under 47 U.S.C. § 332(7)(B)(iii). See, e.g., New York SMSA Ltd. P'ship v. Vill. of Floral Park Bd. of Trs., 812 F. Supp.2d 143, 164 (E.D.N.Y. 2011). In Vill. of Floral Park Bd. of Trs., the district court rejected an argument by the defendant zoning board that the plaintiff wireless carrier "did not establish a need for the special use permit because it did not establish that [its proposal] was the 'least intrusive and only feasible plan' for closing the coverage gap" because "on a substantial evidence claim like the one [the plaintiff] asserts [under 47 U.S.C. § 332(7)(B)(iii)], a public utility is not required to show that its proposed telecommunications facility is the 'least intrusive or only feasible plan' of closing a coverage gap." 812 F. Supp.2d at 164. Rather, the district court observed, that standard is appropriate

in the context of a prohibition-of-wireless-services claim under 47 U.S.C. § 332(7)(B)(i)(II). Id. (citing New York SMSA Ltd. P'ship v. Inc. Vill. of Mineola, No. 01-CV-8211, 2003 WL 25787525, at *5 (E.D.N.Y. 2003)).

The Second Circuit has addressed the distinction between these two standards. Floral Park Bd. of Trs., 812 F. Supp.2d at 164 (citing Omnipoint Commc'ns, Inc., 430 F.3d 529). In the context of a substantial evidence claim brought by the plaintiff, the Second Circuit in Omnipoint Commc'ns, Inc. agreed that the planning board applied "the wrong test" when it required the plaintiff to establish public necessity by showing that its proposal would close a coverage gap in the "least intrusive means." 430 F.3d at 535. The "least intrusive means" requirement "addresses the showing an applicant must make before TCA § 332(c)(7)(B)(i)(II) will *require* a planning board to grant its application." Id. (emphasis in original). By contrast, the Second Circuit explained, the applicable standard on a substantial evidence claim is the public necessity standard under New York law "which concerns the showing that a utility must make under New York law before a zoning board may grant a use variance." Id. (citing Con Ed, 43 N.Y.2d at 611). To establish public necessity, the carrier must demonstrate not that the proposed facility was the "least intrusive means," but rather that the proposed facility was "*more feasible* than other options." Id. (emphasis added).

Moreover, the "least intrusive" standard is not found anywhere in the TKTFL. The only time "intrusive" is mentioned in the TKTFL is in the section pertaining to variances requested by a public utility such as Plaintiff. Specifically, Section 29.5(G) states that if a public utility "demonstrates with substantial evidence it cannot provide service by following all requirements" of the TKTFL, the Board "may grant variances" if the public utility "demonstrate[s] . . . public necessity in that the site is required to render safe and adequate service, that there are compelling reasons, economic or otherwise, which make the site more feasible than properly zoned sites, and the site is *no less intrusive* [sic] of the local zoning than other viable sites." TKTFL § 29.5(G)(1) (emphasis supplied). The phrase "no less intrusive," i.e., "not any less intrusive,"[2] does not mean that the public utility must demonstrate that its proposed site is the "least intrusive."

## B.   Failure to Establish Public Necessity

The Board also found that Plaintiff failed to "establish a need for this tower at this location and height is needed to solve Blue Wireless' alleged gap in wireless coverage." Resolution at 13, 15. The Board's description of the coverage gap as "alleged" suggests it does not accept that Plaintiff has established a coverage gap. The Board noted that in its Application, Plaintiff

---

[2]

The Court believes that what the Board meant to say in this section is "no more intrusive" rather than "no less intrusive."

asserted that "[t]he Blue Wireless network does not currently provide adequate service in the area south of Newland Avenue." Resolution at 10, ¶ 47 (citation to record omitted). The Board observed that Newland is located in the City of Jamestown one mile north of the proposed site, id. ¶ 48, and the Jamestown city line is three-tenths of a mile north of the proposed site, id. Therefore, the Board concluded, a "significant amount of coverage is for service outside the Town of Kiantone." Id. However, in the Resolution, the Board did not meaningfully or substantively dispute the existence of a significant coverage gap.

In contrast, Plaintiff presented a series of Blue Wireless radio frequency ("RF") propagation maps to Defendants which depicted the existing and expected wireless coverage from the proposed tower location at heights of 180 feet and 170 feet, respectively. See Plaintiff's Memorandum of Law ("Pl.'s Mem.") (Dkt #42) at 8 (citing Complaint (Dkt #1), Ex. 13; Amended Complaint ("Am. Compl.") (Dkt #24), Exs. 14 & 19). Eric Wong ("Wong"), an RF engineer and Blue Wireless' Network Director identified the area around 1710 Foote Avenue as the necessary location for a new Blue Wireless site based on RF studies he conducted. See Affidavit of Eric Wong ("Wong Aff.") (Dkt #1-6) ¶¶ 1, 3. These studies revealed that the Town currently does not have coverage from Blue Wireless. Id. ¶ 4. Based on the RF studies he conducted, id. ¶ 7 (citing Exs. 5C, 5D, 5H, & 5I to Dkt #1-6), Wong identified 1710 Foote Avenue as

the necessary location for a new wireless tower; at a height of 180 feet, the proposed tower would "cover businesses along Foote Avenue[;]" "nearby residential neighborhoods in the northern section of the Town of Kiantone[;]" "vehicles moving through the area on Foote Avenue[;]" and "would provide a seamless connection" with Blue Wireless' existing antennas in the City of Jamestown. Id. ¶ 5, which "would allow customers to move between the two coverage areas without experiencing a dropped call or interruption in data service[,]" id. ¶ 7. Wong further averred that if Plaintiff were to site a new tower outside of the required search ring radius, it would result in a coverage gap between the existing Blue Wireless antennas as well as reduced coverage in the target areas. Id. ¶ 6. As Wong acknowledged in his affidavit, Blue Wireless previously had collocated antennas on an existing tower at the corner of Foote Avenue and Brad Street; however, the antennas were removed because this site did not fit with Blue Wireless' network design. Id. ¶ 9. Based on his RF propagation studies showing expected coverage from the extant tower, Wong determined that there were too much overlap with another Blue Wireless site in Jamestown and lack of coverage over the targeted areas in the Town. Id.

Plaintiff notes that Defendants never requested supplemental RF documentation during any of Plaintiff's appearances before the Board. See Pl.'s Mem. at 8 (citing Am. Compl., Ex. 13; Answer (Dkt #26), Exs. 3, 4, & 7 (Dkt #26-1)). Nor did any other party submit

evidence contradicting Plaintiff's RF propagation studies, challenging Wong's qualifications, or questioning the technological foundation of the RF studies. Courts in this Circuit have found this nature and type of evidence sufficient to support a finding of a "significant gap" in wireless coverage. See, e.g., Nextel Partners, Inc. v. Town of Amherst, NY, 251 F. Supp.2d 1187, 1196 (W.D.N.Y. 2003) (plaintiff's RF propagation maps "clearly showed a significant gap" in plaintiff's wireless service in the Town of Amherst where such gaps were "not limited to rural areas or the interior of buildings in sparsely populated areas;" there were "coverage holes near the intersection of New Road and Tonawanda Creek Road;" and tower intended to provide "coverage along Tonawanda Creek Road and . . . at least in-vehicle coverage" on three roads which were "well traveled and certainly [did] not qualify as rural areas"); Omnipoint Commc'ns, Inc. v. Town of LaGrange, 658 F. Supp.2d 539, 559 (S.D.N.Y. 2009) (finding a significant gap where RF propagation maps showed "a complete absence of coverage over a 3.5-mile area along State Route 55 and in the center of the Town of LaGrange").

In sum, the Court finds that Plaintiff presented substantial evidence of a significant coverage gap in wireless coverage which Defendants did not controvert. Accordingly, Defendants' conclusion that Plaintiff failed to establish a need for a wireless tower at

the height and location proposed in its Application is not supported by substantial evidence.

## C.   Failure to Investigate Other Viable Sites

Defendants assert that Plaintiff failed to adequately investigate other potentially viable sites for constructing a new tower or placing an antenna. In particular, Defendants fault Plaintiff for failing to engage in good faith negotiations with George Barton Schuver, Jr. ("Schuver"), the owner of the property identified as Location 19 ("the Schuver property") in Plaintiff's Supplemental Site Selection and Justification Report; failing to explore the option of placing an antenna on a light tower at the Jamestown Sports Complex; and failing to evaluate locations outside of the Town's commercial zoning districts. For the reasons discussed below, the Court finds that none of the reasons are supported by substantial evidence and instead, in some cases, rest on mischaracterizations of the record.

## 1.   Investigation of Alternative Sites

As part of the public necessity test, a zoning board must consider whether there is a more feasible, less intrusive option for the wireless provider to site its facility. See, e.g., Vill. of Floral Park Bd. of Trs., 812 F. Supp.2d at 164–65 ("A local board is justified in considering the availability of alternatives that might create less disruption to the community's zoning plan.") (alterations omitted); N.Y. SMSA L.P. v. Town of Oyster Bay Zoning

Bd. of Appeals, No. 08-CV-4833, 2010 WL 3937277, at *6 (E.D.N.Y. Sept. 30, 2010) (same). "[T]he Court must ascertain whether there is substantial evidence to support the Board's finding that alternative sites were not investigated properly, based on evaluation of the entire record, including opposing evidence." Town of Oyster Bay Zoning Bd. of Appeals, 2010 WL 3937277, at *6; see also N.Y. SMSA Ltd. P'ship v. Inc. Vill. of Mineola, No. 01-CV-8211, 2003 WL 25787525, at *9 (E.D.N.Y. Mar. 26, 2003) ("The court must ascertain whether there is substantial evidence to support the Board's finding that alternative sites were not investigated properly, based on evaluation of the entire record, including opposing evidence.") (citing Am. Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 523 (1981) (in performing substantial evidence review, "court must take into account contradictory evidence in the record")).

In its initial Site Selection and Justification Report, submitted along with its Application, Plaintiff evaluated nine commercial properties along Foote Avenue. To determine each site's viability, Plaintiff looked at whether the site could provide reliable service to remedy Blue Wireless' coverage gap, the land uses surrounding the site, the presence of natural features that could act as a buffer, the capability of constructing a tower on the site, and Plaintiff's ability to obtain a legal interest in the property. Plaintiff found that, within the search ring, there were

no towers or tall structures on which Blue Wireless might collocate its antennas. See Wong Aff. ¶ 20. The Town was informed of Plaintiff's conclusion on this point at the public hearings addressing the Application. Id.

The Board then asked Plaintiff to evaluate additional products within a three-mile search ring around the proposed site on Foote Avenue. Defendants requested that Plaintiff evaluate additional properties that were not properly zoned—and which would have accordingly required another variance under the TKTFL. Plaintiff assessed ten additional properties, predominantly in the B-1 and B-2 (commercial) zoning districts. Plaintiff also assessed three sites that were not commercially zoned. On December 10, 2015, Plaintiff submitted its Supplemental Site Selection Justification Report ("SSSJR"), Am. Compl., Ex. 19 (Dkt #24-2) & Ex. 20 (Dkt #24-3), setting forth all the sites it had evaluated to date.

In the SSSJR Plaintiff explained in detail its rationale for declining to assess properties that were not properly zoned or had existing residential uses and would in turn require another variance. Plaintiff cited TKTFL § 29.9(A) which states that the Board "shall allow siting of new towers only in commercial areas." In addition, Plaintiff cited TKTFL § 29.6(B), which provides that "[n]o new towers shall be allowed within a residential zoning district, or within 250 feet of the boundary of a residential zoning district." Plaintiff also noted that the TKTFL contained a

500-foot tower setback requirement from any public roadway. For each of the possible locations, Plaintiff concluded that, based on a 180-foot radius representing the full tower height setback, and a 280-foot radius representing the additional 100 feet for the fall-down zone as required by TKTFL § 29.8(F), none of the 19 lots in the search area would accommodate these distances. See SSSJR at 1 (Am. Compl., Ex. 20 (Dkt #24-3)).

Defendants, however, focused on Plaintiff's purported "fail[ure] to follow the Town Planning Board recommendations" "to explore options that would be less intrusive, even if the site was not located in a Business Zoning District." Resolution at 14. The Court questions the reasonableness of the Board's demand that Plaintiff explore locations where the placement of wireless facilities is expressly forbidden by the Town's zoning law, given that Plaintiff's pending application for a site *within* the proper zoning district already required six variances, see Resolution at 4-5, which the Board found too intrusive of the Town's zoning. Moreover, Plaintiff *did* explore three sites that were in non-commercially zoned districts but found them unsuitable, as set forth in the SSSJR. The Resolution did not substantively contest the reasons identified by Plaintiff in the SSSJR but instead offered non-substantive, minor criticisms, such as that the maps and drawings were not in the same scale. These criticisms were effectively rebutted by Plaintiff in its opposition to the pending

summary judgment motion. See Pl.'s Mem. at 19-22 (citations to record omitted). After reviewing the record as a whole, the Court is compelled to conclude that the Board's rejection of Plaintiff's application for failing to investigate alternative sites or follow the Board's recommendations was not supported by substantial evidence.

### 2. The Schuver Property

The Schuver Property consists of 87 acres of vacant land located on the west side of Foote Avenue, opposite the proposed 30-foot by 50-foot site on the east side of Foote Avenue. In the Resolution denying Plaintiff's Application, Defendants noted that Schuver appeared at the December 10, 2015 Board meeting and stated that he was willing to negotiate with Plaintiff regarding Lot 19. See Resolution at 13. However, Defendants stated, Plaintiff "indicated at the hearing that [it] was not willing to talk to Mr. Schuver and just wanted the Board to make a decision on [its] application within the 150-day time period of the 'shot clock.'" Id. Defendants concluded that Plaintiff "did not present to the Board any evidence from which the Board could conclude that [Plaintiff] was making a reasonable effort to locate on the less intrusive Schuver property." id. at 14; see also Am. Compl., Ex. 25 (Dkt #24-5).

In its opposition to Defendants' request for summary judgment, Plaintiff has provided more details regarding its evaluation of the

Schuver property. With regard to the viability of the Schuver property, during the initial lease negotiations, Schuver had informed Plaintiff that the tower needed to be located on the northeastern portion of his property along South Avenue so as not to impede any future development of the rest of parcel. See Affidavit of Donald Carpenter ("Carpenter") dated October 30, 2018 ("Carpenter Aff.") (Dkt #42-3) ¶ 21. Carpenter, Plaintiff's consultant on site acquisition and design, averred that accommodating Schuver's request would have located the tower in plain view of multiple residences with no natural buffer and would have required the same or similar variances needed for the 1710 Foote Avenue site. Id. Defendants' assertion that the Schuver property was less intrusive was not supported by substantial evidence.

With regard to Defendants' accusation that Plaintiff did not negotiate in good faith for the Schuver property, the Court finds that this assertion is belied by the record. Carpenter, Plaintiff's consultant, has averred that the parties engaged in extensive negotiations. Schuver requested, and Plaintiff agreed to, a monthly rental payment that exceeded Plaintiff's standard rental payment in the region. See Carpenter Aff. ¶ 23. After reaching agreement on proposed lease terms with Carpenter, id. ¶ 24, Schuver retained a company to renegotiate the lease terms, id. ¶ 25. About a month after his last correspondence with Schuver, Carpenter

received a proposed lease agreement from Schuver's consultant which contained several substantial revisions and new provisions that were objectionable to Plaintiff, "including a 250% increase in rent and a revenue sharing provision that would have increased Up State's monthly rent payment to Mr. Schuver by almost four times what he had requested." Id.

About a week later, on December 7, 2015, Carpenter presented a counter-offer to Schuver which retained the revenue sharing provision (albeit in a reduced amount). Carpenter Aff. ¶ 26 & Ex. C. The next communication between Schuver and Carpenter occurred at the December 10, 2015 Board meeting, at which time Carpenter informed the Board about the lease negotiations with Schuver and the fact that this property still required a number of variances. Id. ¶ 27. When Schuver publicly stated that he was willing to negotiate, Carpenter responded that he was not interested because he believed Schuver "had not acted in good faith to that point" and would not do so going forward. Moreover, because Carpenter had received no response to his December 7, 2015 counter-offer, he assumed negotiations had ended. Id. ¶ 29. Nevertheless, after the meeting, Carpenter continued to communicate with Schuver's consultant, and they exchanged further revisions to the proposed lease agreement. However, the parties could not reach mutually acceptable terms. Id. ¶ 30. Carpenter also had suggested that

Plaintiff could purchase an easement for the use of a portion of the property, but Schuver rejected this idea. Id. ¶ 31.

Based on a review of the record as a whole, the Court finds that the Board's rejection of the Application on the basis that Plaintiff failed to negotiate in good faith with Schuver regarding Location 19 is unsupported by substantial evidence. Moreover, substantial evidence does not support the Board's finding that the Schuver property was actually available or viable, particularly in light of the parties' inability to reach agreement on lease terms. See, e.g., New York SMSA L.P. v. Town of Oyster Bay Zoning Bd. of Appeals, 2010 WL 3937277, at *6 (substantial evidence did not support board's finding that alternative sites not investigated properly where board focused on a local mattress store as a viable alternative site, but the wireless provider "clearly explained" why the site was inappropriate: after significant negotiation, the store owner insisted on a term in the lease agreement that gave either party the right to unilaterally terminate the agreement, meaning that provider could be forced to remove the antennas); Inc. Vill. of Mineola, 2003 WL 25787525, at *9 ("Verizon met its burden of investigating alternatives and presented credible evidence regarding the infeasibility of the sites and the Board presented no evidence to the contrary.").

### 3.   Jamestown Sports Complex

The Board also denied the Application because Plaintiff purportedly failed to investigate locating its antennas on an existing light pole at the Jamestown Sports Complex, as suggested by the Town's consultant, Richard Comi. Defendants noted that "Up State's own RF Engineer, Mr. Wong, . . . indicated at the December 10, 2015 hearing that the gap in coverage could be solved by placing an antenna on a light pole if of proper height and if the pole could hold the equipment." Resolution at 14. Defendants stated that the "light poles on the football field are located at an elevation of 130' to 150' higher than the proposed site" and the "Sports Complex is located approximately 1/4 of a mile from the proposed site." Id.

In opposition to Defendants' summary judgment motion, Plaintiff has submitted another affidavit from Wong, its RF engineer, clarifying his statements at the December 10, 2015 Board meeting. See Second Affidavit of Eric Wong ("2nd Wong Aff.") (Dkt #42-4) ¶¶ 16-18. Wong averred that he advised the Board that "some level of service could theoretically be obtained by collocating on a light pole provided the pole was structurally capable of accommodating an antenna array installation and had the height required to provide reliable service[,]" id. ¶ 16, but he "did not state that any specific light pole(s) in the surrounding area, including any light pole located at the Jamestown Sports Complex, located approximately 1/2 mile away and well outside of the search

ring, could be used to address" the coverage gap. Id. ¶ 17. Since the property was outside of the search ring and as far north as the existing tower at the intersection of Foote Avenue and Brad Street, it presented the same coverage issues as the existing tower, which had been rejected by Blue Wireless for collocation because it overlapped too much with another of its towers and thus did not work within its network. Wong further explained in his affidavit that, in his experience, standard light poles are generally not suitable collocation alternatives because they are designed to accommodate only the lights positioned at the top of the pole and lack the structural integrity for the collocation of a full wireless antenna array. Id. ¶ 18.

The Board concluded that Plaintiff "failed to make contact with the [Jamestown] school [district]" even though the Board had been "informally advised that the school district would be interested in talking about a lease," which information the Board passed on to Plaintiff. Id. Plaintiff responds that on May 9, 2016, Carpenter met with the District's Director of Finance and Business Affairs, Vernon Connors ("Connors") about leasing space for a new tower in the southeast corner of the Jamestown Sports Complex. Carpenter Aff. ¶ 33. Carpenter provided a proposed lease agreement to Connors, and they exchanged emails; however, on November 16, 2016, Conners informed Carpenter by email that the District was not

interested in pursuing a lease agreement with Plaintiff. Id. ¶ 34
& Ex. D.

The Court finds that the Board's rejection of the Application
on the ground that Plaintiff failed to investigate siting its
wireless facility on a light pole or other existing structure is
unsupported by substantial evidence. Contrary to Defendants'
assertion, Plaintiff did explore leasing space on the light tower
at Jamestown Sports Complex, but it was unable to reach an
agreement with the School District. Moreover, Defendants'
contention that the light tower at the Sports Complex was a viable
alternative for placement of Plaintiff's wireless facility appears
to have been based purely on speculation by the Board. See New York
SMSA Ltd. P'ship v. Town of Oyster Bay, No. 11-CV-3077 MKB, 2013 WL
4495183, at *18 (E.D.N.Y. Aug. 16, 2013) ("The Board is required to
support its decision with substantial evidence that the alternative
sites were feasible.") (citing Town of Oyster Bay Zoning Bd. of
Appeals, 2010 WL 3937277, at *6 (noting that "[t]he Board presented
no evidence that other sites were appropriate substitutes for the
Property")).

### D.   Generalized Statements of Concern

The Resolution throughout contains references to the
intrusiveness of the Proposed Site and asserts that other viable,
less intrusive sites are available. However, the Court has not been
able to discern specific reasons based on substantial evidence *why*

1710 Foote Avenue was more intrusive than other sites. The Second Circuit has held that "generalized expressions of concern . . . cannot serve as substantial evidence" on which a municipal planning board may deny a wireless provider's application. <u>Town of Oyster Bay</u>, 166 F.3d at 496. Other than conclusory assertions that the alternatives were more suitable and Plaintiff should have tried harder, the Board did not present substantial evidence that the other sites were feasible. In contrast, Plaintiff investigated the alternatives suggested by the Board, documented its findings, analyzed them, and presented its conclusions in writing and in person to the Board as to why these alternatives were not feasible.

Moreover, the Court notes that the Town's own determination under the New York State Environmental Quality Review Act ("SEQRA"), N.Y. Envtl. Conserv. Law § 8-0109, <u>et</u> <u>seq.</u>, tends to undermine Defendants' position that Plaintiff's proposed facility "is going to cause numerous zoning problems." Defs.' Mem. at 9. In Part 3-Evaluation of the Magnitude and Importance of Project Impacts on the Full Environmental Assessment Form, the Town, as "Lead Agency," stated as follows: "Because the tower exceeds 175 feet in height, it is considered a Type I action under SEQR by the Town of Kiantone, and a full EAF [Environmental Assessment Form] has been completed. Part 2 of the EAF identifies that the project will have *no significant impacts or small impacts* on the

environment." SEQRA Determination, Ex. A to Declaration of Jon Devendorf (Dkt #42-2, p. 30 of 33) (emphasis supplied). The Town further concluded that "[t]his project will result in no significant adverse impacts on the environment" and therefore a "negative declaration [was] issued." Id. (Dkt #42-2, p. 31 of 33).

**E. Conclusion and Remedy**

For the foregoing reasons, the Court finds that the Board's Resolution denying Plaintiff's Application is not supported by substantial evidence. Accordingly, Defendants cannot be granted summary judgment with respect to Count V of the Amended Complaint. E.g., T-Mobile Ne. LLC v. Inc. Vill. of E. Hills, 779 F. Supp.2d 256, 272 (E.D.N.Y. 2011).

The TCA does not specifically provide a remedy for violations of the various provisions of 47 U.S.C. § 332(c)(7). At least for violations of the substantial evidence provision, 47 U.S.C. § 332(c)(7)(B)(iii), "almost all courts to address the question have held that 'the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits.'" T-Mobile Northeast LLC v. Town of Ramapo, 701 F. Supp.2d 446, 463 (S.D.N.Y. 2009) (quoting Town of Oyster Bay, 166 F.3d at 497 (collecting cases)); see also Omnipoint Commc'ns, Inc. v. Town of LaGrange, 658 F. Supp.2d 539, 562 (S.D.N.Y. 2009) (declining town's request to remand matter to planning board; remand would "be both futile and inappropriate" due to the "considerable evidence of past delay on the [t]own's part

and the only 'useful purpose' that would be served by remand" would be "allowing local officials to delay the inevitable for as long as possible").

The record before the Court compels the conclusion that, in denying the Application, the Board did not adduce "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Town of Oyster Bay, 166 F.3d at 494 (citations omitted). The Court is further convinced, given the completeness of the record, that the Board could not find substantial evidence in the record on which to deny the Application again, should the matter be remanded. Therefore, the Court finds, further proceedings before the Board would be futile. Accordingly, the Court grants Plaintiff's request for injunctive relief and directs the Town to grant the Application and issue all necessary variances. See, e.g., New Cingular Wireless PCS, LLC v. Town of Fenton, 843 F. Supp.2d 236, 258 (N.D.N.Y. 2012).

## ORDERS

For the foregoing reasons, it is hereby

**ORDERED** that Defendants' Second Motion for Summary Judgment is denied; and it is further

**ORDERED** that judgment as a matter of law is granted to Plaintiff on Count V of the Amended Complaint because Defendants violated 47 U.S.C. § 332(c)(7)(B)(iii), insofar as the reasons for

their written denial of Plaintiff's Application were not supported by substantial evidence in the record; and it is further

**ORDERED** that the Resolution issued by the Board denying the Application is vacated; and it is further

**ORDERED** that Defendants promptly approve Plaintiff's Application and grant and issue all required variances.

The Clerk of Court is directed to close this case.

**SO ORDERED.**

**s/ Michael A. Telesca**

_____
HON. MICHAEL A. TELESCA
United States District Judge

Dated:     March 11, 2019
           Rochester, New York.